**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**AIDA L. COSTA,**

      **Plaintiff,**

**-vs-**                                                 **Case No. 6:12-cv-1307-Orl-DAB**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed for a period of disability and disability insurance benefits on May 5, 2008, alleging an onset of disability on June 1, 2007[1], due to rheumatoid arthritis in her hands and wrists,

---

[1] Plaintiff amended the onset date to June 1, 2007 at the hearing. R. 36.

Case 6:12-cv-01307-DAB Document 23 Filed 01/10/14 Page 2 of 20 PageID 433

causing pain and inflammation, and leg, shoulder, and back pain, and depression. R. 17, 149-52, 170. Her application was denied initially and upon reconsideration. R. 94-99. Plaintiff requested a hearing, which was held on April 9, 2010, before Administrative Law Judge Julia A. Gibbs (hereinafter referred to as "ALJ"). R. 29-86. In a decision dated August 27, 2010, the ALJ found Plaintiff not disabled as defined under the Act through the date of her decision. R. 14-28. Plaintiff timely filed a Request for Review of the ALJ's decision. R. 12-13. The Appeals Council denied Plaintiff's request on June 22, 2012. R. 5-8. Plaintiff filed this action for judicial review on August 27, 2012. Doc. 1.

### B. Medical History and Findings Summary

Plaintiff was 49 years old on her amended alleged disability onset date, June 1, 2007 R. 36); and 50 years old on the date her date of last insured for disability benefits, June 30, 2008. R. 19, 34, 36, 151. She completed eleventh grade and had past relevant work experience as a childcare worker. R. 32, 69, 171-72, 197-201.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of rheumatoid arthritis in her hands/wrists, and left leg, knees, shoulder, and back pain, as well as depression. R. 48-53, 170. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from rheumatoid arthritis, which was a "severe" medically determinable impairment, but was not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 19. The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform light work except that she could not lift more than ten pounds. R. 21. Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work. R. 23. Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based

on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as usher, hostess, and ticket taker. R. 24-25. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time from November 1, 2005[2] to June 30, 2008. R. 25.

Plaintiff now asserts two points of error. First, she argues that the ALJ erred by finding she had the RFC to perform light work with certain restrictions contrary to treating doctors' statements. Second, she argues that the ALJ erred in evaluating her pain and credibility. For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) *(*citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206,

---

[2]The ALJ failed to use Plaintiff's amended the onset date of June 1, 2007. R. 36.

1210 (11th Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.  20 C.F.R. § 404.1520(f).

## III.   ISSUES AND ANALYSIS

### A.   Residual Functional Capacity

Plaintiff claims that the ALJ should not have found her able to perform light work with the ability to lift up to ten pounds after failing to adequately consider all of her medical conditions and the opinions of her treating physicians. The Commissioner argues that the ALJ appropriately considered the medical evidence and opinions in assessing Plaintiff's RFC and substantial evidence supports the RFC finding.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

In this case, the ALJ determined Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b), except she could not lift more than ten pounds. R. 21. Plaintiff argues that the ALJ erred in determining her RFC and in rejecting her treating rheumatologist, Dr. Quintero's opinion that Plaintiff was limited to sitting/standing for two hours out of an eight hour work day, could never lift any weight and could not use her arms/hands and her legs/feet for repetitive work, and she would require complete freedom to rest throughout the day. R. 347-48. Dr. Quintero also opined that these limitations were present since at least June 30, 2008 "given the chronic deformities and bony changes." R. 348.

The ALJ accurately summarized Dr. Quintero's RFC opinion and limitations for Plaintiff, stating:

-5-

>As for the opinion evidence, Dr. Quintero opines in August 2010, that the claimant cannot lift any weight, that she can sit or stand for less than 2 hours in an 8-hour workday, that she cannot resort to pushing or pulling or fine manipulation, that she cannot use her feet for repetitive movement and that she needs complete freedom to rest frequently. Dr. Quintero notes however that although the claimant's symptoms may have been present before, she only started seeing the claimant in March 2009 (Exhibit 10F).

R. 23. The ALJ rejected Dr. Quintero's opinion because:

>As stated above, the claimant did have similar symptoms for many years and was able to work at SGA levels. This aside, the opinion expressed by Dr. Quintero is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. Furthermore, it is completely inconsistent with the claimant's history of treatment and the rest of the evidence of record for the relevant period of adjudication, which renders it less persuasive. Finally, a claimant's residual functional capacity or a finding of disability are not medical issues, but are administrative findings that are reserved to the Commissioner. Accordingly, medical opinions expressed in this form can never be given controlling weight or special significance, even if they are given by a treating physician (SSR 96-5p, 20 CFR 404.1527(e) and 416.927(e)).

R. 23.

Plaintiff argues that the ALJ erred in failing to properly credit Dr. Quintero's opinion because there was no contrary opinion from a treating, examining or reviewing source or from any other physician. Plaintiff also argues that the ALJ ignored relevant evidence of Plaintiff's hands and x-rays documenting her condition taken on March 11, 2009 and incorporated into Dr. Quintero's notes. Plaintiff argues that the ALJ's decision is deficient in failing to mention the fact that Plaintiff's wrists are fused, the findings regarding her feet, or the x-ray of her feet which would have impacted Plaintiff's RFC, since a person who has no movement in her hands would not have the ability to perform light work[3] with no other manipulative limitations since it requires "a good deal of walking

---

[3]The regulations define light as "Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing – the primary difference between sedentary and most light jobs. A job is also in the category when it involves sitting more of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work." Social Security Ruling 83-10.

or standing" with "some pushing and pulling of arm-hand or leg-foot controls," and the use of arms and hands to grasp and hold objects.  *See* Social Security Ruling 83-10.

Plaintiff also argues that the ALJ erred in failing to indicate the weight she assigned to Dr. Quintero's opinion in violation of the Eleventh Circuit's standard the ALJ is required to utilize in considering medical opinion evidence set forth in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Plaintiff also argues that the ALJ erred in failing to weigh the opinion of Plaintiff's primary care physician, Dr. Alban Bacchus, who noted on October 16, 2007 (before Plaintiff's date of last insured) that Plaintiff had swelling and pain in her wrists, could not flex them, and was unable to lift or carry weight. R. 271, 329.

The Commissioner argues that the ALJ properly weighed Dr. Quintero's opinion and gave it the weight it deserved.  The Commissioner contends that Dr. Quintero actually expressed uncertainty rather than a definitive opinion that Plaintiff's alleged limitations had been present before the DLI (June 30, 2008) and prior to the date when Dr. Quintero began treating Plaintiff R. 348).  The Commissioner argues that, inasmuch as Dr. Quintero's opinion regarding Plaintiff's limitations did not relate to the time period in question, *i.e.*, from the amended alleged onset date until the DLI, the opinion was irrelevant to the RFC assessment. Doc. 18.  The Commissioner also points to the ALJ's notation that she had considered all of the opinion evidence in accordance with the requirements of the cited Social Security Regulations and Rulings[4] ( R. 21), as supportive of the ALJ's rejection of Dr. Quintero's opinion on Plaintiff's RFC and the question of disability, since those are determinations for the ALJ to make R. 23).

The Commissioner notes the ALJ stated that she found Dr. Quintero's opinion "less persuasive," in light of its inconsistencies with Plaintiff's history of treatment and the rest of the

---

[4]20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

evidence of record for the relevant period of adjudication R. 23), and argues "it is clear" from the ALJ's decision that she discounted the opinion, since she articulated specific reasons for doing so R. 23) – the ALJ noted that, in addition to the fact that Dr. Quintero had not begun treating Plaintiff until nine months after the date last insured, Plaintiff had had symptoms similar to those she complained of to Dr. Quintero for many years prior, yet had been able to work at SGA levels R 23).

The Commissioner argues that Dr. Quintero failed to provide any support for her opinion that the limitations she noted "probably" were present since at least the amended alleged onset date, instead conceding that she had not treated Plaintiff before that time R. 348). The Commissioner also argues the only support Dr. Quintero gave for her speculation that the limitations she noted in her opinion had been present at least since the date last insured was a notation stating that Plaintiff had "chronic bony deformities & bony changes," R. 348) without any dates, or citation to objective or clinical findings, including from the relevant time period; and she failed to state why she believed that the "deformities & bony changes" were present prior to the DLI.

The Commissioner also argues that the ALJ properly rejected Dr. Quintero's opinion because it was inconsistent with Plaintiff's history of treatment R. 23), where Plaintiff had not generally received the type of medical treatment one would expect for a totally disabled individual R. 22), treatment notes showed Plaintiff's symptoms responded to medication prescribed by Dr. Quintero, her reports consisted of complaints of being only "a little achy" R. 330-48), and the record reflected significant gaps in Plaintiff's history of treatment, and only very rare treatment from specialists. R. 22. Plaintiff saw an arthritis doctor in 2005, but the record did not indicate that she saw this doctor after that R. 22, 173- Dr. Baskaran[5]). The Commissioner also points out Plaintiff did not start seeing Dr. Quintero until 2009, 15 years after her initial diagnosis; and then there was a gap in treatment by

---

[5]The only record is a response to a request for records that contains a handwritten note dated July 17, 2008: "No records on this patient. May have been seen in hospital only." R. 295.

-8-

Dr. Quintero from November of 2009 to June of 2010, also indicating that the symptoms were not as severe as initially alleged R. 22); Plaintiff saw even her primary care physician, Alban Bacchus, M.D., very infrequently, with breaks as long as two years between appointments R. 22, 271-73). The Commissioner contends that Plaintiff's reports in August 2008 that she had never had an x-ray taken of her back, shoulder, or hands, and use of only over the counter medication were indications of conservative treatment R. 22, 181); the first x-rays were taken in March of 2009, several months after the DLI R. 22-23, 344). The Commissioner also argues that other factors noted by the ALJ, such as Plaintiff's reports to Dr. Quintero that she improved with medication, had a normal musculoskeletal examination by Dr. Bacchus in June of 2008, just prior to the DLI, and extensive activities of daily living are other indications of lack of serious symptoms R. 22-23, 181, 203, 272, 328, 339-40).

It is undisputed that Plaintiff has a history of a rheumatoid arthritis diagnosis, with flare ups for many years and sporadic treatment from Dr. Bacchus, her primary care doctor; he treated Plaintiff from January 1994 to June 2008 for complaints related to joint pain from rheumatoid arthritis. R. 220-94. Rheumatoid arthritis is a generalized disease which primarily affects connective tissue in may joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is *chronic and progressive*, leading to deformities and disability. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006) (emphasis added).

At the hearing, Plaintiff testified that she could not afford treatment for her arthritis until she was able to start seeing Dr. Quintero through the Arthritis Foundation. R. 37, 57. She went to the rheumatologist once her father agreed to pay for it and received help through the Arthritis Foundation. R. 57-58. Plaintiff testified that in 2007 she could not grab anything with her dominant right hand and she could not move it; on her left hand, her fingers went back and were all swollen, including her

-9-

wrist; her wrists were basically fused and she could not move certain fingers, including her thumb, middle finger, and ring finger, at all. R. 45-48, 51. Consequently, she could not write, type, open jars, and she has no grip; she has to wear a brace all of the time on the right wrist. R. 49-50, 56. Even with the medications, she still had the limitations and swelling noted at the hearing. R. 57.

Although Dr. Bacchus' notes on Plaintiff's treatment are sparse[6], the records from 1994 note a history of rheumatoid arthritis and swelling, tenderness, decreased range of motion, pain with movement, and positive crepitus, left knee swelling and pain, and right shoulder pain, as well as a positive rheumatoid serology, arthropathy, and neuropathy. R. 259, 284. Plaintiff's right shoulder was swollen in December 1994. R. 259. In May 1995, she complained of right wrist pain. R. 260. Dr. Bacchus documented in March 1998 that Plaintiff had arthritis of the hands, elbow and wrists. R. 261. Her symptoms had improved on Prednisone a few months later, although she still had moderate swelling and grasping problems in the joints of her hands. R. 262. In July 1998 Plaintiff was seen with severe arthritis of the hands; her hands were stiff, contracted, and she had swollen PIP joints, and her right wrist hurt; Motrin was not much help. R. 282. She returned complaining of the pain in hands, wrist, face and ankles from arthritis in August 1998; Dr. Bacchus prescribed Prednisone, follow up of Plaintiff's sedimentation rate in 14 days, and noted they should consider Methotrextrate for two to five weeks. R. 281. In October 1998, and Dr. Bacchus recommended Methotrextate and referral to Dr. Ross[7]. R. 289.

In November 1998, Plaintiff returned to Dr. Bacchus complaining of pain, swelling, and tenderness in her knees, arms/shoulders, and neck; he prescribed Prednisone and Voltarea to treat her rheumatoid arthritis and discontinued Methotextrate. R. 263. When she returned a ten days later, her

---

[6]Although Dr. Bacchus' handwriting is not perfectly legible, most of it is decipherable.

[7]It is not clear if Plaintiff ever saw a Dr. Ross, and there are no records from Dr. Ross in the Record.

arthritis was better and much improved on Voltarea. R. 279. In early 1999, Plaintiff returned complaining of pain in her left foot – specifically pain in her bones at the base of her great toe were tender and caused her to wobble. R. 265. She was seen again in May 2002 for joint aches in her shoulders, back, buttocks, and knee, with reduced range of motion in these joints due to arthritis; her right hand had swelling in the PIP joint. R. 267, 275. In December 2003, Plaintiff returned complaining of arthritis in her left hand/wrist with swelling, pain and reduced range of motion. R. 274.

In April 2006 she was seen for arthritis complaints, and Dr. Bacchus noted she took Aleve as needed. R. 272. Plaintiff returned to see Dr. Alban Bacchus on October 16, 2007, for wrist pain. R. 271, 329. Dr. Bacchus' noted that Plaintiff had swelling and pain with any movement in her wrists, and she was unable to lift or carry weight; she also could not flex her wrists. R. 271. Plaintiff eventually began treatment with Dr. Quintero in March 2009 (nine months after the date last insured) at the Arthritis Clinic in West Palm Beach; Plaintiff complained of discomfort involving her hands, wrists, and feet. R. 344-46. She reported to Dr. Quintero that she had been diagnosed with rheumatoid arthritis 15 years prior and was treated with Celebrex and another arthritis medication[8]. R. 344. However, she reported not having seen a rheumatologist on a regular basis and taking Advil as needed. R. 344. By the time she saw Dr. Quintero, she reported being in so much discomfort involving hands, wrists and feet that she found it very difficult even to do things around the house and being unable to work in many years. R. 344. Physical examination showed both wrists were contracted, especially the right one, with mild superimposed soft tissue swelling on top of that. R. 344. She had surgery on her hand at age 38 (in 1997) and left first MTP joint (in her foot) was

---

[8]Plaintiff told Dr. Quintero she could not remember the name of the other medication but did not think it was Methotrexate because it was not a weekly dosing. R. 344. However, Dr. Bacchus' records indicate she was prescribed Methotrexate at least for some time.

intervened ten years before (in 1999), but it looked subluxed and the toe was pointing medially, and there was a big separation between the big toe and the second one. R. 344.

The Commissioner mirrors the ALJ's finding that, despite her complaints of arthritis, Plaintiff's earning records indicated that she was able to work at levels above SGA from 1996 to 2003, despite having tested positive for the rheumatoid arthritis factor and elevated sedimentation rate in February of 2002, long before her alleged onset date; she continued to work in 2002 and the following year. R. 22, 157, 161 (2002 earnings of $4,500; 2003 earnings of $6,976). The ALJ summarized the records from Dr. Quintero as follows:

> The claimant did not see Dr. Maricarrnen Quintero, MD, a rheumatologist, until March 2009 (Exhibit 9F, p. 15), almost nine months after the date last insured. Shortly after the beginning of treatment, the claimant reported improvement with medications (Exhibit 9F, p. 9-11). In fact, in June 2009, the claimant has good fists and good grasps, no discomfort in her knees, good range of motion ofthe knees and no edema (Exhibit 9F, p. 9). Between November 2009 and June 2010, the claimant did not see her rheumatologist (Exhibit 9F, p. 1, 4) which indicates that the symptoms were not as severe as initially alleged.
>
> The record reveals that the claimant's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date. The claimant experienced swelling, wrist pain and numbness since 1994 and was in fact diagnosed with rheumatoid arthritis then (Exhibit 1F, p. 41-42). She complained of symptoms off and on between1996 and 2001 (Exhibit IF, p. 42-48). In fact, in 1998, the claimant was diagnosed with severe arthritis of the hands (Exhibit IF, p. 64). Her earning records indicate that she worked at levels above SGA during all this time (Exhibit 5D). The fact that the impairment did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work.

R. 22.

The ALJ and the Commissioner ignore the nature of Plaintiff's chronic and erosive rheumatoid arthritis condition and the impact of the *additional* condition of severe osteoarthritis of the wrists and feet, as diagnosed by Dr. Quintero, as well as Plaintiff's inability to afford the appropriate specialist treatment and medications. According to the American Arthritis Association, "Rheumatoid arthritis is a chronic disease, meaning it can't be cured[,]" and some people have intermittent symptoms or

-12-

"flares," while "others have ongoing symptoms that worsen over time." *Salazar v. Astrue,* 859 F.Supp.2d 1202, 1227 (D.Or. 2012[9]) ; *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 864 n. 1 (4th Cir. 2011) ("Rheumatoid arthritis is 'an inflammatory disease of the joints that causes the joints to swell and to stiffen. It is a chronic condition, permanent in nature.'") (quoting *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 946 (7th Cir. 2000)); *see also Lowe v. Apfel*, 238 F.3d 429 (Table), 2000 WL 1290356, at *2 (9th Cir. Sept. 12, 2000) (Kleinfeld, C.J., dissenting) ("Rheumatoid arthritis . . . is characterized by '[s]pontaneous remissions and exacerbations.'"). In addition, Plaintiff *also* suffered from "severe osteoarthritis" of the hands, "wrists to the point of almost fusion" and the feet. Once Plaintiff was able to see Dr. Quintero[10], the rheumatologist, through the Arthritis Foundation the x-rays and physical examination by Dr. Quintero documented Plaintiff's "longstanding erosive" condition within nine months (March 2009) of Plaintiff's date of last insured (June 2008). Both the ALJ and the Commissioner contend that Plaintiff's failure to take the arthritis medication was the result of a lack of severity of symptoms, however, it is clear from Plaintiff's testimony and Dr. Quintero's records that Plaintiff had problems affording the Enbrel medication[11] or receiving it through the Arthritis Foundation patient assistance plan, and was required to stop taking it when she developed a respiratory infection and had foot surgery. R. 330, 341. Moreover, once her treatment was established she did not need to be seen as frequently. *See Salazar v. Astrue,* 859 F.Supp.2d 1202,

---

[9]The district court cites the website of the American Arthritis Association http:// www. arthritis.org/types-what-is-rheumatoid-arthritis.php.

[10]The Court notes that Plaintiff resides in Orlando and Dr. Quintero's office is in Palm Beach, Florida, a three-hour drive. There are certainly rheumatologists closer to Plaintiff's home though they may not participate in the Arthritis Foundation's program. Dr. Quintero commented on April 13, 2009 that they were going to try to get approved for the Enbrel patient assistance program and would provide samples regardless. R. 341. Plaintiff's medications would "now be covered by the Foundation" since she had a new insurance, but her office did not accept the insurance. R. 330.

[11]Enbrel is a brand name for the drug etanercept, which is an injectable medication "indicated for reducing signs and symptoms, inducing major clinical response, inhibiting the progression of structural damage, and improving physical function in patients with moderately to severely active rheumatoid arthritis (RA). Enbrel can be initiated in combination with methotrexat or used alone." http://www. rxlist.com/enbrel-drug/indications-dosage htm (visited December 30, 2013).

1227 (D. Or. 2012) (holding the fact that plaintiff's condition was stable on her medication regimen, requiring only an annual evaluation to determine whether her dosage levels remained appropriate, did not equate with a finding that she had the residual functional capacity to work).

Dr. Quintero diagnosed Plaintiff with long-standing, erosive rheumatoid arthritis *and* superimposed osteoarthritis, especially involving the wrists. R. 344-45. Osteoarthritis is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). Dr. Quintero noted x-ray results showed mild ulnar deviations bilaterally, with deformities especially on the left side, and severe osteoarthritic changes involving both wrists to the point that there was hardly any space in between the carpal bones and they looked almost fused, especially on the right side. R. 344-46. Plaintiff also had marked periarticular osteopenia and bony changes involving the MCP joints, and erosion involving the right second MCP joint[12]. R. 346. She had positive tenderness with palpation of the midfoot especially on the left side. R. 344. X-rays of the hands showed periarticular osteopenia, severe osteoarthritic changes involving both wrists and possible erosions. R. 344. X-rays of the feet showed significant osteoarthritic changes involving the MTP joints[13], as well as the possibility of erosions. R. 344.

When Dr. Quintero saw Plaintiff on April 13, 2009, she noted that combination therapy "is what works the best, especially in a case like hers." R. 341. She tolerated the Methotrexate, although she was a little more tired the day she took it; the steroids helped, although she was still symptomatic,

---

[12]Metacarpophalangeal joints are those in the fingers, except the thumb. Arthritis of the MCP is a distinguishing feature of Rheumatoid Arthritis.

[13]Metatarsophalangeal joints are those between the metatarsal bones of the foot and the proximal bones (proximal phalanges) of the toes.

-14-

although better but still feeling the pain in her hands, wrists, shoulders, and knees with limited range of motion in the shoulders and wrists which were fused. R. 340. Although Plaintiff continued to improve in May 2009, she was only 25% better, with reduced swelling but she still had chronic bony changes involving the MCP joints consistent with chronic pannus and moderate limitation of moth of both shoulders. R 339. In June 2009, she was tolerating the medication but her joints remained "a little bit achy," in the hands, wrists and shoulders but overall she was a "little bit more stable." R. 338. Plaintiff reported the Prednisone was causing some GI discomfort; she still had limitation in the shoulders but "good fists and good grasp," although her wrists remained fused from the osteoarthritis. R. 338. When she was seen in the Arthritis Foundation Clinic by Dr. Quintero in August 2009, she reported feeling "alright" but was feeling discomfort in the hands and sometimes in the shoulders, and she had smoldering soft tissue swelling in some of the MCP joints and in her wrists, with continued limited range of motion in the shoulders, which was her "baseline." R. 336. At the November 2009 appointment, Plaintiff reported side effects from the Methotrexate, which Dr. Quintero discontinued. R. 334-34. She discontinued it, along with the Enbrel because she was advised to as part of the treatment for an upper respiratory tract infection. R. 333. She was having a hard time getting the Enbrel from the patient assistance program, although Dr. Quintero gave her some samples. R. 333. She had fair fist and grasp, with slight soft tissue swelling involving the second MCP joint bilaterally. R. 333. She had foot surgery in February 2010 to correct some deformities in her left foot and some toe deviations from a previous surgical intervention which were corrected with the second surgery, and she was advised to stop the medications, but she described increased pain in her hands, wrists, shoulders, elbows, and sometimes in her knees and her feet. R. 330. When she returned to Dr. Quintero in June 2010, she advised her to restart the medications but noted both wrists were fused, with slight soft tissue swelling in some of the MCP joints, ulnar deviation, and interosseous muscle

atrophy, and there was prominence of the ulnar styloid bilaterally, with moderate limitation of motion of both shoulders at the baseline level.  R. 330.

On August 5, 2010, Dr. Quintero completed a physical capacities evaluation/medical assessment form, prepared by Plaintiff's attorney.  R. 347-48.  Dr. Quintero checked off on the form that Plaintiff could never lift any weight, could sit or stand for less than 2 hours in an 8-hour workday, could not resort to pushing or pulling or fine manipulation, could not use her feet for repetitive movement, and needed complete freedom to rest frequently and without restriction.  R. 347-48.  Dr. Quintero opined on the form that Plaintiff's limitations had "probably" been present since at least May 1 2007 (the amended alleged onset date), Dr. Quintero noted she had first seen Plaintiff on March 11, 2009. R. 348.  Dr. Quintero also opined that in her medical opinion, Plaintiff's limitations had been present since at least June 30, 2008 – Plaintiff's date of last insured – "given the chronic deformities and bony changes."  R. 348.  The Commissioner argues that Dr. Quintero did not give a "definitive opinion" indicating that the limitations had been present prior to June 30, 2008 because she in effect qualified her answer that it was "based on chronic deformities and bony changes."

However, Dr. Quintero is a specialist in treating rheumatoid arthritis and rheumatic diseases. *See, e.g.,* R. 346.  As a specialist in the disease Plaintiff suffers from, Dr. Quintero's opinion is entitled to controlling weight as long as it supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  "Generally, treating physicians' opinions are given more weight than non-treating physicians; and the opinions of specialists are given more weight on issues within the area of expertise than those of nonspecialists." *Baker v. Astrue*, 2011 WL 899311, *7 (M.D. Fla. Mar. 14, 2011) (citing *McNamee v. Soc. Sec. Admin.*, 162 F. Appx. 919, 923 (11th Cir. Jan. 31, 2006) (unpublished); 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5) (the following factors are

relevant in determining the weight to be given to a physician's opinion: (1) the "Length of the treatment relationship and the frequency of examination"; (2) the "Nature and extent of treatment relationship"; (3) "Supportability"; (4) "Consistency" with other medical evidence in the record; and (5) "Specialization").

Dr. Quintero diagnosed Plaintiff with "longstanding, erosive rheumatoid arthritis" *and* severe osteoarthritis in the hands and significant osteoarthritis in the feet. The x-ray of the hands and feet taken on March 2009, within nine months of Plaintiff's date of last insured, showed "severe osteoarthritis of the wrists to the point of almost fusion"; Plaintiff had deformities in the ulnar styloid[14], especially on the left side, severe osteoarthritic changes involving both wrists with hardly any space in between the carpal bones, especially on the right side, and marked periarticular osteopenia[15], and erosion involving the right second MCP joint. R. 346. The x-rays of Plaintiff's feet showed significant osteoarthritic changes in the MTP joints including osteophytosis and joint space narrowing, with erosive changes involving the fifth MTP joint and the first MTP joint on the left, with subchondral cyst formations in some of the MTP joints as part of the osteoarthritis; and post-surgical intervention[16] involving the left first MTP joint, with screws in place and the joint subluxed with the toe pointing medially. R. 346. Plaintiff argues that the ALJ failed to mention or discuss these relevant x-rays.

The Commissioner argues that the ALJ complied with the requirements of the Social Security Regulations by *mentioning* the March 2009 x-rays and the fact that they showed osteoarthritis of the wrists and feet. However, the ALJ mentioned the x-rays to discount the severity of Plaintiff's

---

[14] The protrusion at the wrist opposite the thumb that serves as an attachment site for the ulnar collateral ligament.

[15] Bone deterioration around the joint, commonly found in fingers.

[16] Plaintiff had two surgeries on her left foot to correct some deformities and toe deviations due to a previous surgical intervention, corrected in the second one. R. 330.

limitations, not in recognizing them. The ALJ cited the x-rays in the context of concluding that "Plaintiff had received very conservative treatment," since she reported in August of 2008 that she had never had an x-ray taken of her back, shoulder, or hands, and the earliest one was not until March of 2009, which showed osteoarthritis of the wrists and feet. R. 22-23. The ALJ fails to *discuss* the severity of the findings in the x-rays or explain why they would not relate back to Plaintiff's date of last insured, June 2008. The ALJ merely concludes:

> The claimant testified that she did not seek medical help on a regular basis because she did not have health insurance. Yet, she was still able to see a rheumatologist in 2009 despite the fact that she still does not have health insurance. The undersigned also notes that the record does not reflect that the claimant pursued any other avenues available to her even in this unfortunate situation, especially given her allegations of disabling pain and reduced range of motion.

R.23.

The Commissioner also argues the March 2009 x-rays were completed after the June 2008 date of last insured and "were irrelevant to the time period at issue," citing *Mason v. Comm'r of Soc. Sec.*, 430 F. App'x 830, 832-833 (11th Cir. 2011) (holding where "the medical record contain[s] a retrospective diagnosis, that is, a physician's post-insured-date opinion that the claimant suffered a disabling condition prior to the insured date, we affirm only when that opinion was consistent with pre-insured-date medical evidence"). The Commissioner further argues the March 2009 x-rays were irrelevant because "no physician opined that they were reflective of Plaintiff's diagnoses or condition before her insured status expired." Doc. 21.

Plaintiff argues that even though Dr. Quintero offered her opinion regarding Plaintiff's limitations after the date last insured, "a treating physician's opinion is still entitled to significant weight notwithstanding that he did not treat the claimant until after the relevant determination date." *Boyd v. Heckler*, 704 F.2d 1207, 1211 (11th Cir. 1983), *superceded by statute on other grounds. Accord Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981); *Stark v. Weinberger*, 497 F.2d 1092,

-18-

1097 (7th Cir. 1974). Dr. Quintero, Plaintiff's treating specialist in rheumatoid arthritis, opined based on x-rays and physical examinations, and her experience treating the disease that Plaintiff's limitations were present since June 30, 2008 based on Plaintiff's "chronic deformities and bony changes" R. 348) from "longstanding, erosive rheumatoid arthritis" *and* severe osteoarthritis in the hands and significant osteoarthritis in the feet, as evidenced in Dr. Quintero's treatment records of Plaintiff, and Dr. Bacchus' records from pre-2007. R. 346.

Moreover, to the extent that the ALJ found Plaintiff remained employed at SGA levels after Plaintiff began experiencing symptoms as far back as 1994 (sixteen years before the decision), the Court notes at least a 50% drop in her earnings and significant decline in earnings and amount of work once her symptoms grew worse after 2001, which is not inconsistent with an "erosive" disease. Plaintiff worked steadily from 1992 to 2000 as a daycare teacher for two-year olds, with increasing levels of pay each year. R. 157. In 2000, Plaintiff made almost $16,000. R. 157. As she explained, with her increasing wrist and hand problems, when she was not able to lift the two-year-old children any longer, and the daycare owner eventually put her to work in the office because she did not want to let her go; she left in 2001. R. 43-44. Until 2005, Plaintiff was self-employed answering the phone at home and keeping track of two or three workers' hours in her husband's tree service business during 2005. R. 40-41, 171. In 2002, Plaintiff made $4,500, $6,976 in 2003, and $2,466 in 2005, and she has not worked since 2005. R. 40, 157, 171.

Because the ALJ failed to identify Plaintiff's severe osteoarthritis in her wrists/hands and feet, and account for the limitations in her RFC, the ALJ's decision was not based on substantial evidence. The ALJ erred in finding that Plaintiff had only "rheumatoid arthritis" without further elaboration in a single sentence in her decision, and without any description whatsoever of the erosive osteoarthritic impact to Plaintiff's wrists, hands, and feet. R. 19. As a consequence of this omission, the ALJ also

erred in failing to include the appropriate limitations on Plaintiff's abilities to use her hands and feet for repetitive work or remaining on her feet and standing for long periods of time at the light level, in the RFC and in the hypothetical to the VE. On remand, the ALJ will address Plaintiff's credibility, RFC, and hypothetical in light of consideration of the objective evidence of severe osteoarthritic permanent damage to Plaintiff's wrists, hands, and feet.

## IV.   CONCLUSION

For the reasons set forth above, the ALJ's decision is not consistent with the requirements of law and is not supported by substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on January 10, 2014.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record